UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

CURTIS ANDERS BROWN,

     Petitioner,

v.                                Case No.  3:16cv363-LC-CJK

JULIE L. JONES,

     Respondent.

_____/

## REPORT AND RECOMMENDATION

Before the court is an amended petition for writ of habeas corpus filed under 28 U.S.C. § 2254.  (Doc. 4).  Respondent filed an answer, providing relevant portions of the state court record.  (Docs. 19, 21).[1]  Petitioner replied.  (Doc. 25).  The matter is referred to the undersigned Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(B).  After careful consideration, the undersigned concludes that no evidentiary hearing is required for the disposition of this matter.  Rule 8(a) of the Rules Governing Section 2254 Cases in the United States District Courts.  The undersigned further concludes that the

---

[1] Portions of the electronic file at Doc. 19 were damaged and unreadable.  Respondent re-filed the damaged portions at Doc. 21, which consists of: Respondent's Answer in Response to Order to Show Cause; Ex. B, pp. 248-65; Ex. C; Ex. D; and Ex. E, pp. 1-15.

pleadings and attachments before the court show that petitioner is not entitled to habeas relief.

## BACKGROUND AND PROCEDURAL HISTORY

In the early morning hours of July 25, 2009, the victim Misty Shelby left the motel room she shared with her boyfriend, and started walking to the Cutty Sark, a bar/liquor store. (Doc. 19, Ex. E, pp. 126-27). Shelby had been arguing with her boyfriend, was intoxicated, and wanted to buy more cigarettes and alcohol. (*Id.*, pp. 127, 151). Shelby's boyfriend walked part of the way with her, but she told him to go back to the motel after they continued to argue. (*Id.*, p. 127). As Shelby walked alone, a black Dodge pick-up truck passed her. (*Id.*, p. 129). As it turns out, petitioner was driving the truck. (*Id.*).

When Shelby arrived at the parking lot of the liquor store, she observed petitioner in his black pick-up truck parked at the far end of the store. (*Id.*, p. 129). Shelby tried the door to the store, but it was locked. (*Id.*, pp. 128, 130). The store closed at 3:00 a.m. (*Id.*). Petitioner called Shelby over to his truck. (*Id.*, p. 130). When Shelby approached, petitioner asked her if she wanted a ride, but she said no. (*Id.*, pp. 130-32). As Shelby turned to walk away, petitioner opened the door of his truck and struck Shelby with it, causing her to fall to the ground. (*Id.*). Petitioner

then got out of his truck, grabbed Shelby by the hair, and pulled her into his truck. (*Id.*).  Shelby identified petitioner, in court, as the man who pulled her into the truck. (*Id.*, p. 133).

Shelby could not get out of petitioner's truck because the door was locked. (*Id.*, pp. 133-34).  Petitioner backed out of the liquor store and drove toward Citrus Road.  (*Id.*, p. 134).  Shelby was afraid for her life.  (*Id.*).  Shelby told petitioner to let her out, but petitioner said he was taking her somewhere, "he's got a place for us to go."  (*Id.*, p. 135).  Petitioner flashed money in his left hand.  (*Id.*, p. 160).  Shelby tried to get petitioner to drive to the motel (because her boyfriend was there and "it was a way to get out [of] the truck"), but petitioner refused.  (*Id.*, p. 135).  Shelby repeatedly begged petitioner to let her out of the truck, but he refused.  (*Id.*, pp. 137-40).  At one point Shelby tried to throw the truck into park, but petitioner reached over, "back-handed" her on the left side of her face, and restored the gear to drive. (*Id.*, pp. 138-39).  Shelby decided she had to get out of the truck even if it meant jumping.  (*Id.*).  Shelby testified: "At that point I reached over, I opened the door, I looked down at the ground and all I could say is God help me, I'm fixing to die.  And he reached over and pushed me."  (*Id.*, p. 140).  Petitioner pushed Shelby "pretty hard" out of the moving vehicle while simultaneously accelerating.  (*Id.*, pp. 140-

41).  Shelby bounced off the concrete and eventually gathered herself.  She saw homes nearby and started knocking on doors screaming for help while also trying to hide from petitioner's view.  (*Id.*, pp. 142-43).  Petitioner, in the meantime, drove his truck back and forth along the road, revving the engine.  (*Id.*, pp. 142-43).  Shelby eventually heard a voice calling to her from across the road.  (*Id.*, pp. 143-44).  Shelby crossed and saw two men fishing near a lake.  (*Id.*, p. 144).  One of the men called 911, and an ambulance arrived.  (*Id.*, pp. 145).  Shelby was taken to a local emergency room where she was treated for multiple abrasions to the face, knees, left upper arm and right arm.  (*Id.*, pp. 117-18).  Shelby also had a broken nose.  (*Id.*).  Shelby was later contacted by law enforcement and shown a photo line-up.  (*Id.*, p. 145).  She identified petitioner out of the lineup as the perpetrator.  (Doc. 19, Ex. E, pp. 146-47 and Ex. F, pp. 206-207; Doc. 21, Ex. B, pp. 255-56).

Petitioner was charged in Escambia County Circuit Court Case No. 2009-CF-5361, with kidnapping to inflict bodily harm or to terrorize the victim (Count 1) and felony battery with great bodily harm, permanent disability or permanent disfigurement (Count 2).  (Doc. 19, Ex. A, p. 4).[2]  Petitioner's first trial ended in a

---

[2] Where a page of an exhibit bears more than one page number, the court cites the number appearing at the bottom center of the page.

mistrial.  (Doc. 19, Ex. A, p. 40; Doc. 21, Ex. D, pp. 226-28).  After a second jury trial on June 28, 2011, petitioner was found guilty of both counts as charged.  (Doc. 19, Ex. F, pp. 287-88 (reading of verdict); Doc. 19, Ex. A, p. 144 (written verdict)).  Petitioner was adjudicated guilty and sentenced to consecutive terms of 30 years' imprisonment for the kidnapping and 5 years' imprisonment for the battery.  (Doc. 19, Ex. A, pp. 183-90 (judgment and sentence)).  On June 7, 2013, the Florida First District Court of Appeal (First DCA) affirmed the judgment per curiam without opinion.  *Brown v. State*, 114 So.3d 940 (Fla. 1st DCA 2013) (Table) (copy at Doc. 19, Ex. I).

On August 28, 2014, petitioner filed a *pro se* motion for postconviction relief under Florida Rule of Criminal Procedure 3.850, which he twice amended.  (Doc. 19, Ex. J, pp. 1-50, 59-110, 113-84).  The state circuit court denied relief without an evidentiary hearing.  (Doc. 19, Ex. K, pp. 185-254).  The First DCA affirmed per curiam without opinion.  *Brown v. State*, 197 So. 3d 44 (Fla. 1st DCA 2016) (Table) (copy at Doc. 19, Ex. N).  The mandate issued August 30, 2016.  (Doc. 19, Ex. P).

Petitioner filed his original federal habeas petition on July 13, 2016.  (Doc. 1, p. 1).  Petitioner's amended petition raises five claims – four grounds of ineffective assistance of trial counsel and one ground of trial court error.  (Doc. 4).

## SECTION 2254 STANDARD OF REVIEW

Federal courts are precluded from granting a habeas petition on a claim that was adjudicated on the merits in state court unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court's factual determinations are presumed correct, unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

The United States Supreme Court explained the framework for § 2254 review in *Williams v. Taylor*, 529 U.S. 362 (2000).[3] Justice O'Connor described the appropriate test:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct

---

[3] Unless otherwise noted, references to *Williams* are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367-75, 390-99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and – except as to the footnote – Scalia) in part II (529 U.S. at 403-13). The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412-13 (O'Connor, J., concurring).

Under the *Williams* framework, the federal court must first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). The law is "clearly established" only when a Supreme Court holding at the time of the state court decision embodies the legal principle at issue. *See Thaler v. Haynes*, 559 U.S. 43, 47 (2010); *Woods v. Donald*, 575 U.S. —, —, 135 S. Ct. 1372, 1376 (2015) ("We have explained that clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions." (internal quotation marks and citation omitted)).

After identifying the governing legal principle(s), the federal court determines whether the state court adjudication is contrary to the clearly established Supreme Court case law. The adjudication is not contrary to Supreme Court precedent merely because it fails to cite to that precedent. Rather, the adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court cases. *See Early v. Packer*, 537 U.S. 3, 8 (2002) ("Avoiding th[e] pitfalls [of § 2254(d)(1)]

does not require citation to our cases – indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.").  Where there is no Supreme Court precedent on point, the state court's conclusion cannot be contrary to clearly established federal law.  *See Woods*, 135 S. Ct. at 1377 (holding, as to claim that counsel was *per se* ineffective in being absent from the courtroom for ten minutes during testimony concerning other defendants: "Because none of our cases confront the specific question presented by this case, the state court's decision could not be contrary to any holding from this Court." (internal quotation marks and citation omitted)).  If the state court decision is contrary to clearly established federal law, the federal habeas court must independently consider the merits of the petitioner's claim.  *See Panetti v. Quarterman*, 551 U.S. 930, 954 (2007).

If the "contrary to" clause is not satisfied, the federal habeas court next determines whether the state court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases.  The federal court defers to the state court's reasoning unless the state court's application of the legal principle(s) was "objectively unreasonable" in light of the record before the state court.  *See*

*Williams*, 529 U.S. at 409; *Holland v. Jackson*, 542 U.S. 649, 652 (2004).  The

Supreme Court described the "unreasonable application" standard this way:

> When reviewing state criminal convictions on collateral review, federal
> judges are required to afford state courts due respect by overturning
> their decisions only when there could be no reasonable dispute that they
> were wrong.  Federal habeas review thus exists as "a guard against
> extreme malfunctions in the state criminal justice systems, not a
> substitute for ordinary error correction through appeal."  *Harrington,
> supra*, at 102-103, 131 S. Ct. 770 (internal quotation marks omitted).

*Woods*, 135 S. Ct. at 1376 (*quoting Harrington v. Richter*, 562 U.S. 86 (2011)).  The

§ 2254(d) standard "is difficult to meet . . . because it was meant to be."  *Richter*,

562 U.S. at 102.

Section 2254(d) also allows federal habeas relief for a claim adjudicated on

the merits in state court where that adjudication "resulted in a decision that was based

on an unreasonable determination of the facts in light of the evidence presented in

the State court proceeding."  28 U.S.C. § 2254(d)(2).  The "unreasonable

determination of the facts" standard is implicated only to the extent the validity of

the state court's ultimate conclusion is premised on unreasonable fact finding.  *See

Gill v. Mecusker*, 633 F.3d 1272, 1292 (11th Cir. 2011).  As with the "unreasonable

application" clause, the federal court applies an objective test.  *See Miller-El v.

Cockrell*, 537 U.S. 322, 340 (2003) (holding that a state court decision based on a

factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding."). Federal courts "may not characterize . . . state-court factual determinations as unreasonable merely because we would have reached a different conclusion in the first instance." *Brumfield v. Cain*, 576 U.S. —, —, 135 S. Ct. 2269, 2277 (2015) (quotation marks omitted).

Only if the federal habeas court finds that the petitioner satisfied § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See Panetti*, 551 U.S. at 954. Even then, the writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).

DISCUSSION

Ground One    <u>"Counsel Rendered Ineffective Assistance By Failing To Discover/Surface A Bias[ed] Juror During Voir Dire Proceedings. . . ."</u>  (Doc. 4, p. 6).

Petitioner claims trial counsel was ineffective during jury selection when he failed to adequately question Juror Sindel to discover her anti-defendant bias. Sindel disclosed on her jury questionnaire that her occupation was "community activist". (Doc. 19, Ex. E, pp. 86-87). The prosecutor questioned Sindel about that response:

MS. SMITH [Prosecutor]:  What areas are you active in?

PROSPECTIVE JUROR [SINDEL]:  I'm on the board for Navy League.  I'm on the board for Tiger Bay Panhandle.  I've done volunteer work with the pink ribbon tennis tournaments, Spring Fest, WSRE wine event.

MS. SMITH:  Is there anything about these charges that would affect your ability to be fair and impartial if you were chosen as a juror?

PROSPECTIVE JUROR:  No, ma'am.

MS. SMITH:  Okay.  You could listen to all the evidence, the total picture?

PROSEPCTIVE JUROR:  Oh, yes.

MS. SMITH:  And you understand that the defendant has the right to remain silent, doesn't have to put on any evidence?

PROSPECTIVE JUROR:  Absolutely.

(Doc. 19, Ex. E, p. 87).  Petitioner asserts that Sindel's disclosure "would indicate an anti-crime activist that would more likely be prejudicial toward those defendants accused of criminal offenses."  (Doc. 4, p. 8).  Petitioner contends that had counsel asked the right questions after this exchange, counsel would have discovered that Sindel was on the board of directors of a local chapter of Crime Stoppers – a fact counsel later discovered after trial and used to argue for a new trial based on juror misconduct (which was denied after evidentiary hearing).  Petitioner claims that

counsel's deficient questioning during jury selection "allow[ed] a biased member of the venire to serve on defendant Brown's jury, which resulted in prejudice that precluded a fair trial[.]" (*Id.*, p. 9).

The parties agree that petitioner presented this ineffective assistance claim to the state courts as Ground One of his Rule 3.850 motion; that the state circuit court denied relief; and that the First DCA summarily affirmed without explanation. (Doc. 4, pp. 10-11; Doc. 21, pp. 16-19). The First DCA's summary rejection of the claim warrants deference under 28 U.S.C. § 2254(d). *See Richter*, 562 U.S. at 100 ("This Court now holds and reconfirms that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'").

A.     Clearly Established Federal Law

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court set out a two-pronged standard for ineffective assistance of counsel claims. The petitioner must show that (1) his counsel's performance was constitutionally deficient, and (2) the deficient performance prejudiced him. *See Strickland*, 466 U.S. at 687. "First, petitioner must show that 'counsel's representation fell below an objective standard of reasonableness. Second, petitioner must show that 'there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"  *Darden v. Wainwright*, 477 U.S. 168, 184 (1986) (*quoting Strickland*, 466 U.S. at 694).

"Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689.  Trial counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690.   The burden to overcome that presumption and to show that counsel's performance was deficient "rests squarely on the defendant." *Burt v. Titlow*, 571 U.S. 12, 22-23 (2013); *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) ("To overcome that presumption, a defendant must show that counsel failed to act reasonably considering all the circumstances." (quotation marks and alterations omitted)).  "[T]he absence of evidence cannot overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance." *Titlow*, 571 U.S. at 23 (quotation marks and alterations omitted).

*Strickland*'s prejudice prong requires a defendant to establish a "reasonable probability" of a different result. *See Strickland*, 466 U.S. at 694. A reasonable probability is one that sufficiently undermines confidence in the outcome. *Id.* "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

When a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. *See Strickland*, 466 U.S. at 698. "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Richter*, 562 U.S. at 105. As the Court in *Richter* explained:

> The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Id.* (citations omitted).

B.    Section 2254 Review of State Court's Decision

Where, as here, there has been one reasoned state judgment rejecting a federal claim followed by a later unexplained order upholding that judgment or rejecting the same claim, federal habeas courts employ a "look through" presumption. *Wilson v. Sellers*, — U.S. —, 138 S. Ct. 1188 (2018). The *Wilson* Court described this presumption as follows:

> We hold that the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

*Id.* at 1192. Applying *Wilson*'s "look-through" presumption, the First DCA's rejection of petitioner's claim was neither contrary to, nor an unreasonable application of the *Strickland* standard.

The state circuit court identified the governing legal standard as the *Strickland* standard, (doc. 19, Ex. K, p. 186), and rejected petitioner's claim for these reasons:

> Defendant claims trial counsel was ineffective for failing to exercise due diligence and discover a biased juror. According to defendant's allegations, juror Karen Sindel failed to disclose her

involvement with Gulf Coast Crime Stoppers as a board member. During a December 5, 2011, hearing, trial counsel argued Sindel's position with Gulf Coast Crime Stoppers resulted in her having a close working relationship with law enforcement. Counsel asserted had he known of her involvement, he would have moved to strike her from the panel. The trial court denied the motion for new trial and found counsel had failed to exercise due diligence during voir dire to discover this information. Defendant asserts Sindel was an anti-crime activist and more likely prejudiced against those accused of a criminal offense. He asserts the prejudice that precluded him from having a fair trial is on the face of the record, and but for the biased juror, the outcome of his trial would have been different.

At the December 5, 2011, hearing, Amy Miller, chairman of the board of Gulf Coast Crime Stoppers, testified Sindel had been a board member from May 13, 2010, to her resignation on July 1, 2010, and served on the Student Crime Stoppers Committee. (Exhibit A, p. 5.) The last meeting Sindel attended was May 12, 2011. (Exhibit A, p. 7.) Although law enforcement could attend the monthly board meetings, there was no discussion of cases at the board meeting, and the Student Crime Stoppers Committee dealt with school issues. (Exhibit A, pp. 6-9.) The State argued Sindel had no contact with law enforcement as part of her involvement with Crime stoppers, and her involvement was not relevant and material to jury service. (Exhibit A, pp. 22-24.) Trial counsel argued Sindel's involvement was not enough for a challenge for cause, but he would have used a peremptory had he known of her involvement. (Exhibit A, p. 32.) The State agreed there would not have been reason for a cause challenge. (Exhibit A, pp. 38-39.)

In the order denying a new trial, the trial court found there was no testimony the juror had friends or family members in law enforcement or any additional interaction with law enforcement, beyond law enforcement showing up occasionally at a board meeting for a free lunch, as a result of Sindel's involvement with Crime Stoppers, and there was no juror misconduct. (Exhibit B.)

As also noted by the trial court in its order, during jury selection, prospective jurors were asked if anyone had such a positive view of law enforcement or such a close relationship with a law enforcement officer that they could not be fair and impartial. (Exhibit C, pp. 63-65.) There was no indication from the prospective jurors that such was the case or that they would give law enforcement more credence than other witnesses. (Exhibit C, pp. 63-65.) Sindel was later questioned about being a community activist, and she affirmed she could be a fair and impartial juror. (Exhibit C, pp. 86-87.)

Defendant's allegation that Sindel was biased is conclusory and speculative. His allegations fail to show Sindel was actually biased against him and that the bias is plain on the face of the record. *See Wade v. State*, 156 So. 3d 1004, 1033-34 (Fla. 2014); *Carratelli v. State*, 961 So. 2d 312, 324 (Fla. 2007). The record in fact indicates otherwise.

(*Id.*, pp. 186-88).

In arguing the performance prong, petitioner makes much of the trial court's finding (on review of petitioner's motion for new trial) that counsel failed to exercise due diligence in questioning Ms. Sindel. (Doc. 4, pp. 7-9; Doc. 25, p. 2). Petitioner believes this finding overcomes the presumption of competence. The trial court made that finding, however, in the context of determining whether Sindel's failure to disclose her past involvement with Crime Stoppers was attributable to her concealment, or to counsel's failure to ask questions that Sindel would reasonably understand to encompass her involvement with Crime Stoppers. (Doc. 4, p. 8 (*citing*

*Ottley v. Kirchharr*, 917 So. 2d 913 (Fla. 1st DCA 2006))).  The Florida Supreme Court defines its due diligence standard this way:

> '[T]he due diligence test' requires that counsel provide a sufficient explanation of the type of information which potential jurors are being asked to disclose, particularly if it pertains to an area about which an average lay juror might not otherwise have a working understanding. Thus, resolution of this 'diligence' issue requires a factual determination regarding whether the explanations provided by the judge and counsel regarding the kinds of responses which were sought would reasonably have been understood by the subject jurors to encompass the undisclosed information.

*Roberts v. Tejada*, 814 So.2d 334, 343 (Fla. 2002).  This court need not decide whether Florida's "due diligence" standard is synonymous with *Strickland*'s reasonableness standard, because petitioner's claim fails on *Strickland*'s prejudice prong.

Petitioner grounds his showing of prejudice on the assertion that Ms. Sindel was biased due to her involvement with Crime Stoppers.  To show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *Strickland*, 466 U.S. at 694, petitioner must show that Juror Sindel was biased; if she were not, then there is no "reasonable probability that . . . the result of the proceeding would have been different."  *Id*.

The requirement of impartiality does not require that jurors "be totally ignorant of the consequences of crime, nor free of opinion towards crime." *United States v. Tegzes*, 715 F.2d 505, 507 (11th Cir. 1983) (*citing Irvin v. Dowd*, 366 U.S. 717, 722-23 (1961)). The fairness of a trial is doubtful only when a veniremember reveals that she "has such a fixed opinion, based on [her] bias [or a presumed bias], that [she] 'could not judge impartially the guilt of the defendant.'" *Depree v. Thomas*, 946 F.2d 784, 788 (11th Cir. 1991) (*quoting Patton v. Yount*, 467 U.S. 1025, 1035 (1984)). If the veniremember confirms that she can be impartial under questioning designed to "'create[ ] a reasonable assurance that prejudice would be discovered if present,'" *United States* v. *Nell*, 526 F.2d 1223, 1229 (11th Cir. 1976) (*quoting United States v. Dellinger*, 472 F.2d 340, 367 (7th Cir. 1972)), she is qualified to sit on the jury. "It is sufficient if the juror can lay aside [her] impression or opinion and render a verdict based on the evidence presented in court." *Irvin*, 366 U.S. at 723.

There is no record evidence that Ms. Sindel was biased or that she concealed information relevant to jury service. During jury selection, the judge informed the venire that the purpose of voir dire was to determine whether their decision would be influenced by any opinion they held or by some personal experience or special

knowledge they had about the subject matter to be tried.  (Doc. 19, Ex. A, p. 60).

The prosecutor informed the jury that members of the Escambia County Sheriff's

Department were potential witnesses and asked if anyone knew the names read.  (*Id*.,

p. 63).    No one, including Ms. Sindel, indicated they knew any of the law

enforcement witnesses.  (*Id*., pp. 63-64).  Ms. Sindel did not indicate she knew *any*

of the potential witnesses.  (*Id*., pp. 63-78).  All the panel promised to follow the law

given to them by the judge.  (*Id*., p. 81).  The prosecutor asked if anyone had such a

positive view of law enforcement or such a close relationship with an officer that

they would not be able to be fair and impartial.  (*Id*., p. 94).  The prosecutor also

asked if anyone would give an officer's testimony more credence than another

witness simply because he or she was an officer.  (*Id*., p. 95).  No one in the venire

raised a hand.  (*Id*., pp. 94-95).  The jury was instructed that its decision must be

based only on the evidence presented in the courtroom.  (*Id*., p. 121).

At the conclusion of the evidence and prior to jury deliberations, the trial court

again instructed the jury that it must presume or believe petitioner was innocent; that

this presumption stayed with petitioner through each stage of the trial; and that it

was the State's burden to prove the crimes beyond a reasonable doubt.  (Doc. 19,

Ex. E, p. 277).  The jury was also instructed that the case must be decided only on

the evidence, and that the verdict must not be decided based on sympathy for, or anger at, any party to the case. (*Id.*, p. 280). The written instructions reiterated those rules. (Doc. 19, Ex. A, pp. 18-37).

Ms. Sindel's involvement with Crime Stoppers does not in and of itself indicate bias. As the state court found, Ms. Sindel had no contact with law enforcement on the Crime Stoppers committee on which she past served, and Ms. Sindel did not conceal her work for Crime Stoppers. The prosecutor asked Ms. Sindel in the present tense what community service she was involved in, not what service she had ever been involved in. At the time of trial, Ms. Sindel was not actively participating in Crime Stoppers. Without any evidence that Ms. Sindel was actually biased or that she failed to follow the trial judge's instructions, petitioner cannot show there is a reasonable probability the result of his trial would have been different had she not served. Petitioner is not entitled to federal habeas relief on Ground One.

> Ground Two        "Counsel Rendered Ineffective Assistance By Failing To Present The Viable Defense Describing The Actual Events of The Alleged Offense In Violation Of The Defendant's Constitutional Rights 'Federal'. . . ." (Doc. 4, p. 11).

Petitioner claims trial counsel was ineffective for failing to present the "viable defense" of "actual events". This defense relied exclusively on petitioner's proposed

testimony that on July 25, 2009, Ms. Shelby agreed to have sex with petitioner for money (to finance her drug habit); that she voluntarily got into petitioner's truck for that purpose; that he placed a $20 bill on the console at her request to assure her she would be paid; and that Shelby suddenly snatched the $20 bill off the console and voluntarily jumped out of the truck to run off with the money, not realizing how fast the truck was going. (Doc. 4, pp. 12-13). Petitioner alleges that approximately 48 hours before trial he informed counsel of his proposed defense, but counsel unreasonably discouraged him from testifying because counsel believed the testimony could be used against petitioner in his other pending criminal cases involving similar sex-related offenses. (*Id.*, pp. 13-14). Petitioner argues that counsel's advice was deficient, because counsel failed to first investigate petitioner's other sexual assault cases to discover that petitioner had a work alibi defense to those charges – an alibi that ultimately led to their dismissal (albeit after petitioner's trial in this case). (*Id.*, p. 14). Petitioner claims that instead of presenting petitioner's valid "actual events" defense, counsel unreasonably opted for an alibi defense supported by perjured testimony (Mr. President's testimony that petitioner was at his home until 3:00 a.m. the morning of the offenses here). (*Id.*, pp. 14-16).

Petitioner asserts that but for counsel's deficient defense strategy, the outcome of his trial would have been different.  (*Id.*, p. 16).

The parties agree that petitioner presented this claim to the state courts as Ground Two of his Rule 3.850 motion; that the state circuit court denied relief; and that the First DCA summarily affirmed without explanation.  (Doc. 4, p. 17; Doc. 21, pp. 19-25).  The First DCA's summary rejection of petitioner's claim warrants deference under 28 U.S.C. § 2254(d).  *See Richter*, 562 U.S. at 100.

A.    Clearly Established Federal Law

The clearly established federal law governing claims of ineffective assistance of counsel is the *Strickland* standard set forth above.

B.    Section 2254 Review of State Court's Decision

Applying *Wilson*'s "look-through" presumption, the First DCA's rejection of petitioner's claim was neither contrary to, nor an unreasonable application of, the *Strickland* standard.  The state circuit court identified the governing legal standard as the *Strickland* standard, (doc. 19, Ex. K, p. 186), and rejected petitioner's claim for these reasons:

> Defendant denies he committed the charged offense and claims trial counsel was ineffective for failing to present a viable defense of actual events.  Defendant alleges that 48 hours before trial, he informed trial counsel of the actual events that took place at the time of the

offense: that he picked up the alleged victim, who was a prostitute; he attempted to pay her in advance for services not yet rendered; and she took $20 in cash and jumped out of his moving vehicle. Defendant further alleges that instead of presenting this defense, trial counsel presented an incorrect alibi defense and elicited perjured testimony. Additionally, Defendant alleges counsel did not want to present Defendant's version of events because Defendant's testimony could be used against Defendant in other cases pending against him involving similar sex related offenses. Defendant contends this tactic was flawed because counsel failed to investigate the other cases and discover prior to trial in the instant case Defendant had a work alibi in the other cases, which were later dismissed.

As for the alibi, Defendant alleges counsel presented perjured testimony by presenting the testimony of Bruce President. Defendant fails to allege how or whether this testimony prejudiced him at trial. Also, Defendant fails to allege what part of the alibi testimony is false or that it was completely false, and the record does not show that it necessarily was. Trial counsel advised the trial court during in camera proceedings held on June 13, 2011, that he did not anticipate bringing forward any witnesses that would give perjured testimony. (Exhibit C, p. 16.) At trial, President testified Defendant was with him at his house from 11:00 p.m. to 3:00 a.m. the night of the offense. (Exhibit C, pp. 224-225.) The victim testified she left the Western Inn to walk to the liquor store between 2:30 and 2:45 a.m. (Exhibit C, p. 126.) She did not have a watch or a clock but was estimating the time, and she was also drunk. (Exhibit C, pp. 126-127, 151.) She testified it took about 10 to 15 minutes to walk from the motel to the store. (Exhibit C, pp. 127, 150.) She further testified the liquor store closes at 3:00 a.m., and it was closed when she got there. (Exhibit C, pp. 128, 151-152.) She did not know if she got there later than 3:00 because she was not looking at a clock. (Exhibit C, pp. 128-129.) The victim had no clue what time it was when she jumped out of the truck but guessed she had been in it about one hour. (Exhibit C, pp. 143, 169-170.) David Hyde, who was near the scene where the victim exited the truck, testified he heard her calling for help about 2:30 or 3:00, but it could have been later. (Exhibit

C, pp. 179-180.)  Deputy Holcombe testified it would take someone about 10 minutes to drive from the liquor store to where he responded to the call after the victim jumped from the truck.  (Exhibit C, p. 198.)

In the first trial, previous counsel informed the trial court she would not be presenting an alibi because the times did not exactly match up.  (Exhibit D, p. 59.)  The victim testified an ambulance came within 15 to 30 minutes of witnesses making a 911 call.  (Exhibit D, pp. 91-92.)  Deputy Holcombe testified the 911 call came in around 4:00 a.m.  (Exhibit D, p. 137.)  The EMS paramedic testified she responded around 4:20.  (Exhibit D, p. 147.)

Some of the evidence would indicate Defendant could not have been both at President's house and at the liquor store because these events were reported to have occurred at the same time.  Other evidence could support a finding that the victim was mistaken as to her estimates of the time, and Defendant left President's house at about 3:00 a.m. and then encountered the victim at the liquor store some time thereafter.  Therefore, Defendant's allegations of having told counsel his version of events do not support a conclusion that counsel knowingly presented perjured testimony.

Had counsel presented Defendant's alternate defense of actual events, there is no reasonable probability of a different outcome.  In the first trial, Defendant's defense was based on misidentification.  (Exhibit D, pp. 187-188, 194.)  In the second trial, counsel also relied on misidentification, as well as an alibi witness.  Based on the evidence, counsel argued the victim was drunk at the time of the offense, and her ability to recall was questionable.  (Exhibit C, pp. 262-263.)  Counsel further argued there were numerous conflicts in the evidence.  He argued the victim testified she did not know Defendant but somehow later remembered she had met him before, and she therefore identified Defendant in a photo lineup due to contact prior to the event.  (Exhibit C, pp. 258-259.)  The victim told Deputy Holcombe it took about an hour to travel from the liquor store to the location she exited the truck, but Deputy Holcombe testified the drive took about 10 minutes.

(Exhibit C, pp. 259-260.)  The victim was unclear about Defendant's tattoos and testified he had one on the inside of his left arm or right arm and never mentioned he had one on his right shoulder, even though he was wearing a tank top.  (Exhibit C, p. 261.)  The victim testified the truck was labeled as a Hemi, but David Hyde testified he did not see any distinguishing marks on the truck.  (Exhibit C, pp. 261-262.)  Other witnesses testified the victim said she jumped out of the truck, although she testified defendant pushed her.  (Exhibit C, p. 262.)

On the other hand, Defendant's version would confirm he was the one the victim encountered at the liquor store, his truck was properly identified, and the victim jumped from his truck while it was in motion, thus incurring her injuries.  In his motion, Defendant speculates the victim thought the truck was moving more slowly than assumed or was stopping, but he is otherwise at a loss to explain why the victim would jump from a moving vehicle.  Also, evidence that the victim was a prostitute and Defendant had picked her up for sexual purposes on several previous occasions would cast Defendant in an unfavorable light.

Based on Defendant's allegations and the record, counsel's trial strategy was not unreasonable under the circumstances.  *See Occhicone v. State*, 768 So. 2d 1037, 1048 (Fla. 2000).  Counsel used a trial strategy substantially similar to the one used in the previous trial, in which Defendant was not convicted.  As to the decision not to use the alternate defense of actual events, Defendant alleges counsel knew of an alibi in the other cases pending against Defendant.  Even if counsel had investigated and obtained alibi evidence in the other cases prior to the June 2011 trial, whether the State would have dismissed the other cases prior to the trial in the instant case is speculative.  Also, Defendant informed the trial court his decision not to testify at trial was his own. (Exhibit C, pp. 243-247.)

Defendant also alleges on June 13, 2011, counsel informed the trial court of an impasse between Defendant and himself and sought to withdraw.  Defendant further alleges he wanted the truth to be told, but

counsel failed to inform the trial court of Defendant's actual defense, leaving the trial court to assume that Defendant had confided guilt to counsel and would testify falsely. This part of Defendant's claim fails to state a basis for deficient performance of counsel resulting in prejudice at trial.

(Doc. 19, Ex. K, pp. 188-92).

The state court's findings are amply supported by the record and are presumed correct. Based on the record, this court cannot say that no "fairminded jurist could agree" with the state court's determination that counsel's advice and defense strategy fell within the wide range of reasonable professional assistance, and that petitioner failed to establish a reasonable probability of a different trial outcome had counsel pursued petitioner's proposed defense instead of the misidentification/alibi defense. Petitioner is not entitled to habeas relief on Ground Two.

<u>Ground Three</u>    "<u>Counsel Rendered Ineffective Assistance By Failing To Adequately Oppose The State's Motion In Limine In Violation of The Defendant's Constitutional Amendment Provisional Rights 'Federal'</u>". (Doc. 4, p. 18).

Petitioner claims trial counsel was ineffective for failing to oppose the State's motion in limine to prohibit any mention of the victim's past or present prostitution or illegal drug use. Petitioner asserts counsel should have opposed the motion because the prostitution evidence was relevant to Shelby's credibility and tended to prove petitioner's proposed "actual events" defense described in Ground Two above.

(Doc. 4, pp. 18-22).  The parties agree that petitioner presented this claim to the state courts as Ground Three of his Rule 3.850 motion; that the state circuit court denied relief; and that the First DCA summarily affirmed without explanation.  (Doc. 4, pp. 22-23; Doc. 21, pp. 25-28).  The First DCA's summary rejection of petitioner's claim warrants deference under 28 U.S.C. § 2254(d).  *See Richter*, 562 U.S. at 100.

A.    Clearly Established Federal Law

The clearly established federal law governing claims of ineffective assistance of counsel is the *Strickland* standard set forth above.

B.    Section 2254 Review of State Court's Decision

Applying *Wilson*'s "look-through" presumption, the First DCA's rejection of petitioner's claim was neither contrary to, nor an unreasonable application of *Strickland*.  The state circuit court identified the governing legal standard as the *Strickland* standard, (doc. 19, Ex. K, p. 186), and rejected petitioner's claim for these reasons:

> Defendant claims trial counsel was ineffective for failing to adequately oppose the State's motion in limine, which prevented him from cross examining the victim as to her prior reputation for prostitution and drug use.  He asserts this evidence would have been more probative than prejudicial, as it would tend to prove the truth of his viable defense.  Defendant also asserts a right to attack the credibility of the victim through reputation evidence.

Counsel was not ineffective for failing to challenge the motion in limine. Even if evidence that the victim was a prostitute was relevant to the defense of actual events raised in Ground Two, that defense was not presented, and counsel was not ineffective for not doing so. Defendant's allegations fail to show the victim's alleged drug use was relevant to the defense of actual events. *See Wright v. State*, 19 So. 3d 277, 291-92 (Fla. 2009).

As to the defense actually used at trial, Defendant fails to show counsel was ineffective for failing to challenge the motion in limine regarding the victim's alleged prostitution and drug use, as such would not have been admissible to attack her credibility. *See Fernandez v. State*, 730 So. 2d 277, 282-83 (Fla. 1999); *Pintado v. State*, 970 So. 2d 857, 859-60 (Fla. 3d DCA 2007); § 90.608(3), Fla. Stat. Section 794.022, Florida Statutes, cited by Defendant, and applicable to prosecution under section 794.011, Florida Statutes, does not provide authority to attack the reputation of the victim under the facts of this case.

(Ex. K, p. 192).

Again, the state court's factual findings are amply supported by the record and are presumed correct. Based on the record and the defense theory actually presented at trial, fairminded jurists can concur in the state court's determination that petitioner failed to establish deficient performance and prejudice under *Strickland*. Petitioner's proposed basis for opposing the motion in limine did not have a reasonable chance of success under federal or state evidentiary principles. Petitioner fails to show how Shelby's alleged prostitution and drug use was relevant to his misidentification/alibi defense or to Ms. Shelby's credibility. Concerning the latter, trial courts retain

discretion to limit cross-examination to protect against factors such as "'harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that [would be] repetitive or only marginally relevant.'"  *Olden v. Kentucky*, 488 U.S. 227, 232 (1988) (*quoting Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)); *see also Van Arsdall*, 475 U.S. at 678 ("[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (emphasis in original)); *Childers v. Floyd*, 736 F.3d 1331, 1335 (11th Cir. 2013) (stating that the underpinnings of the Florida rules of evidence concerning the admissibility of evidence, including impeachment evidence "fit hand in glove with the rights guaranteed under the Confrontation Clause").

Counsel cannot be ineffective for failing to make a meritless argument.  *See Insignares v. Sec'y, Fla. Dep't of Corr.*, 755 F.3d 1273, 1284 (11th Cir. 2014) ("The state judge had a reasonable basis to decide that counsel was not deficient for failing to raise non-meritorious objections." (*citing Chandler v. Moore*, 240 F.3d 907, 917 (11th Cir. 2001))); *Freeman v. Attorney Gen. Fla.*, 536 F.3d 1225, 1233 (11th Cir. 2008) ("A lawyer cannot be deficient for failing to raise a meritless claim. . . ."). Moreover, although not mentioned by the state court, the trial transcript

demonstrates that counsel aggressively challenged Ms. Shelby's credibility and ability to observe and recount the incident during cross-examination of her and other prosecution witnesses. The state court's rejection of petitioner's claim was not contrary to, and did not involve an unreasonable application of, the *Strickland* standard. Nor was the decision based on an unreasonable determination of the facts. Petitioner is not entitled to federal habeas relief on Ground Three.

> Ground Four  "Counsel Rendered Ineffective Assistance Through The Commission of Cumulative Errors In Violation of The Defendant's Constitutional Amendment Provisional 'Federal' Rights."  (Doc. 4, p. 23).

Petitioner's claim of cumulative error is based on the three ineffective-assistance-of-counsel claims addressed above.  Respondent contends that petitioner's cumulative error claim is not cognizable on federal habeas review.  (Doc. 21, p. 29).  Petitioner agrees and abandons this claim.  (Doc. 25, p. 8).  Relief on Ground Four should be denied due to petitioner's abandonment.[4]

---

[4] Even if not abandoned, petitioner's claim fails on the merits.  Because petitioner's individual claims have no merit, he can show no cumulative error. *See Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012).

Ground Five        "The State Court Denied Petitioner Direct Appeal Based On An Unreasonable Determination of The Facts In Light of The Record Before The State Court, When The Trial Court Erred As a Matter of Law In Denying Appellant's Motion For New Trial Because The Uncontroverted Evidence Showed That Foreperson Sindel Concealed Material Information About Her Involvement With Crime Stoppers, Where Such Information Would Have Caused Defense Counsel To Strike Her From The Jury. The Result Has Denied The Petitioner His Due Process Rights of 5th And 14teenth [sic] Amendment of United States; Fair And Impartial Trial." (Doc. 4, p. 25).

Petitioner last claims the trial court erred in denying his motion for new trial alleging juror misconduct based on Sindel's failure to disclose her past involvement with Crime Stoppers. (Doc. 4, pp. 25-28). Although petitioner couches his claim in terms of "due process", he actually presents a purely state law issue – whether the trial court erroneously applied Florida's three-part *De La Rosa* test for determining whether a juror's nondisclosure of information during voir dire warrants a new trial. (Doc. 4, pp. 26-28 (identifying and applying the three-part test articulated in *De La Rosa v. Zequeria*, 659 So. 2d 239 (Fla. 1995), as applied in *McCauslin v. Conner*, 985 So. 2d 558 (Fla. 5th DCA 2008))). Nowhere in petitioner's argument here (or in his counseled brief on direct appeal) does petitioner identify or argue a federal standard governing his juror misconduct claim, nor does he reference a federal decision establishing or applying a federal standard. (*See* Doc. 19, Ex. G). Petitioner

instead confines his argument to state law and state standards.  Likewise, the State's answer to this claim (here and on direct appeal) cites exclusively to state law and argues that the trial court properly applied Florida's three-part *De La Rosa* test. (Doc. 21, pp. 30-35; *see also* Doc. 19, Ex. H).

Federal habeas relief is available to correct only constitutional injury.  *See* 28 U.S.C. § 2254(a) ("[A] district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."); *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) ("The habeas statute unambiguously provides that a federal court may issue a writ of habeas corpus to a state prisoner only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.") (internal quotations and citations omitted); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (holding that errors that do not infringe upon a defendant's constitutional rights provide no basis for federal habeas relief; "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").  "The writ of habeas corpus was not enacted to enforce State-created rights." *Cabberiza v. Moore*, 217 F.3d 1329, 1333 (11th Cir. 2000) (citation and quotation marks omitted);

*Tejada v. Dugger*, 941 F.2d 1551, 1560 (11th Cir. 1991) ("Questions of state law rarely raise issues of federal constitutional significance, because '[a] state's interpretation of its own laws provides no basis for federal habeas corpus relief, since no question of a constitutional nature is involved.'" (*quoting Carrizales v. Wainwright*, 699 F.2d 1053 (11th Cir. 1983))). "This limitation on federal habeas review is of equal force when a petition, which actually involves state law issues, is couched in terms of equal protection and due process." *Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir. 1988). Petitioner's Ground Five provides no basis for federal habeas relief.

## CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides: "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." If a certificate is issued, "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." 28 U.S.C. § 2254 Rule 11(a). A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. *See* 28 U.S.C. § 2254 Rule 11(b).

"[Section] 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'" *Miller-El*, 537 U.S. at 336 (*quoting* 28 U.S.C. § 2253(c)).  "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" *Buck v. Davis*, 580 U.S. —, 137 S. Ct. 759, 774 (2017) (*quoting Miller-El*, 537 U.S. at 327).  The petitioner here cannot make the requisite showing.  Accordingly, the court should deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  28 U.S.C. § 2254 Rule 11(a).  If there is an objection to this recommendation by either party, that party may bring such argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully RECOMMENDED:

1.  That the amended petition for writ of habeas corpus (doc. 4), challenging the judgment of conviction and sentence in *State of Florida v. Curtis Sanders Brown*, Escambia County Circuit Court Case No. 2009-CF-5361, be DENIED.

2.  That the clerk be directed to close the file.

3.  That a certificate of appealability be DENIED.

At Pensacola, Florida this 22nd day of May, 2018.


/s/ *Charles J. Kahn, Jr.*
**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**


<u>NOTICE TO THE PARTIES</u>

Objections to these proposed findings and recommendations may be filed within 14 days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon the magistrate judge and all other parties.  A party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions. *See* 11th Cir. R. 3-1; 28 U.S.C. § 636.